DURINDA HUGHSON, an Infant, by Her Father and Natural Guardian, WILLIAM HUGHSON, Respondent, v ST. FRANCIS HOSPITAL OF PORT JERVIS, Defendant, and STANLEY BRUNN et al., Appellants.

Second Department. March 7, 1983

### APPEARANCES OF COUNSEL

*Meiselman, Farber, Stella & Moran, P. C. (Myra I. Packman* of counsel), for appellants.

*Pegalis & Wachsman, P. C. (Roger K. Solymosy* of counsel), for respondent.

### OPINION OF THE COURT

WEINSTEIN, J.

The issue before us is one of first impression in the appellate courts: whether there exists a cognizable independent cause of action on behalf of an infant, born alive, against a physician, for prenatal injuries arising out of the failure to obtain the informed consent of the mother. The question arises in the posture of a cross motion by the defendant physicians (hereinafter appellants) to dismiss the infant plaintiff's second cause of action. (The first

cause of action on behalf of the infant is for medical malpractice.) The pleadings and papers submitted at Special Term are devoid of any information as to the nature of the injury sustained by the infant or the specific advice which the physicians failed to impart before rendering treatment. We must, therefore, decide the issue on that basis, as did Special Term. We must also, of course, assume the infant plaintiff's allegations to be true (see *Howard v Lecher,* 42 NY2d 109, 112).

We note at the outset that we are not here dealing with a claim for a preconception tort or "wrongful life", claims which do not state legally cognizable causes of action (*Becker v Schwartz,* 46 NY2d 401; *Albala v City of New York,* 54 NY2d 269). Unlike the infants in *Becker* and its companion case of *Park v Chessin* (46 NY2d 401, *supra*), who would assertedly have chosen never to have been born at all rather than to have been born with Down's Syndrome or polycystic kidney disease, the infant at bar would presumably have been born normal and healthy but for the appellants' wrongful act. Unlike the infant in *Albala,* who had not been conceived at the time his mother's uterus was negligently perforated during a prior abortion (allegedly resulting in brain damage to the later conceived infant), the infant at bar was an identifiable being within the zone of danger at the time of the wrongful act. Thus, this case would appear to fall squarely within the general rule that a surviving child has a right to recover for tortiously inflicted prenatal injuries (*Woods v Lancet,* 303 NY 349; *Kelly v Gregory,* 282 App Div 542).

There being no problem as to the ascertainment of damages, and causation being assumed, the only issue is as to the appellants' duty. While foreseeability of future injury alone does not establish the existence of a duty owing to an unborn infant by its mother's physicians, it is now beyond dispute that in the case of negligence resulting in prenatal injuries, both the mother and the child *in utero* may each be directly injured and are each owed a duty, independent of the other (*Albala v City of New York, supra,* p 272).

We hold that the nature of the tort, predicated on a failure to obtain informed consent, is insufficiently distinguishable from other tortious acts which may result in

recovery by the child, and that therefore, encompassed within the independent duty flowing between doctor and infant *in utero* is the obligation of the physician to obtain informed consent from the parent.

Appellants do not claim that they can never be liable for the injuries sustained by the infant *in utero*. Rather, they argue that their obligation to disclose the risks and alternatives of obstetric care runs to the mother, who must necessarily consent for both herself and the infant *in utero;* that the infant's cause of action must therefore be held to be derivative to the mother's cause of action; and that, since the mother asserts no cause of action for lack of informed consent and, indeed is time barred from doing so, the infant's claim must fail. More particularly, appellants rely upon *Shack v Holland* (89 Misc 2d 78), which upheld an infant plaintiff's cause of action against a doctor for lack of informed consent of the mother. Insofar as pertinent, Special Term (MONTELEONE, J.) there reasoned as follows (p 85):

"Having concluded that the unborn plaintiff has a cause of action and that the duty to disclose the reasonable foreseeable risks involved is grounded in negligence, the immediate question is whether this plaintiff has a cause of action against this defendant for lack of informed consent to the mother of the child here involved.

"The court is convinced that the second cause of action on behalf of plaintiff, Neil Shack, states a good cause of action. The court finds that although the obligation to disclose runs to the mother, plaintiff, Neil Shack, then unborn but within his mother's womb, comes within the area of persons to be protected. The lack of informed consent of the mother would have its effect upon the fetus to be born for good or ill. A child in its mother's womb is a foreseeable circumstance. Conduct, which creates a risk of harm to a woman, includes also a risk of harm to her unborn child. The standard of care imposed upon the doctor by the statute inures to the benefit of her unborn child. This is a classic example of derivative liability whereby a plaintiff may institute an action to redress a wrong done to himself which is proximately caused by a wrong done to another."

Although upholding the second cause of action on behalf of the infant, Special Term in *Shack* dismissed the third cause of action on behalf of the mother for damages for loss of services and medical expenses. The mother's claim, being derivative, could not be tolled along with the infant's main claim and, hence, was barred by the Statute of Limitations.

Defendants misread *Shack*. While Special Term did therein speak of "derivative liability" and redressing "a wrong done to [a plaintiff] which is proximately caused by a wrong done to another", it clearly did not use that term in the strict legal sense. Had that been the case, the infant's cause of action for lack of informed consent would have been dismissed as well, since any claim by the mother for lack of informed consent was also time barred and the derivative cause could not then stand by itself.

Appellants also argue that section 2805-d of the Public Health Law, which governs the cause of action for lack of informed consent, must be strictly construed. Since the statute does not specifically authorize a fetus to maintain a claim for lack of informed consent for obstetrical care rendered to the mother, appellants urge that no such right of recovery may be implied by the courts.

Section 2805-d of the Public Health Law reads as follows:

"Limitation of medical malpractice action based on lack of informed consent

"1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.

"2. The right of action to recover for medical malpractice based on a lack of informed consent is limited to those cases involving either (a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body.

"3. For a cause of action therefor it must also be established that a reasonably prudent person in the patient's

position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought.

"4. It shall be a defense to any action for medical malpractice based upon an alleged failure to obtain such an informed consent that:

"(a) the risk not disclosed is too commonly known to warrant disclosure; or

"(b) the patient assured the medical practitioner he would undergo the treatment, procedure or diagnosis regardless of the risk involved, or the patient assured the medical practitioner that he did not want to be informed of the matters to which he would be entitled to be informed; or

"(c) consent by or on behalf of the patient was not reasonably possible; or

"(d) the medical practitioner, after considering all of the attendant facts and circumstances, used reasonable discretion as to the manner and extent to which such alternatives or risks were disclosed to the patient because he reasonably believed that the manner and extent of such disclosure could reasonably be expected to adversely and substantially affect the patient's condition."

In our view, the infant plaintiff's cause of action is viable and independent. A child is not legally competent to give binding consent to any medical services rendered to his or herself. It is the parent who gives effective consent (Public Health Law, § 2504, subd 2), notwithstanding that it is the child who is the "patient". Perforce, a fetus or infant *in utero* is also unable to give legal consent, much less, as a practical matter, any consent at all. It is the pregnant mother to whom we must look. That patients, themselves incapable of giving legal consent, may have their treatment authorized by other competent individuals or authorities has already been judicially recognized. Thus, in *Matter of Strauss* (56 AD2d 570, 571), this court held that section 2805-d of the Public Health Law was "clearly not intended to prevent a court from authorizing necessary surgery upon mental patients in State institutions who are

incapable of giving consent" (see, also, *Matter of Storar,* 52 NY2d 363, 380-381). Just as clearly, section 2805-d cannot be read to deny such minor or legally incompetent patients protection against incompetent advice or unauthorized treatment merely because they are not the persons from whom the law requires consent. Rather, the statutory cause of action for lack of informed consent must be read together with the statutory and case law dealing with who may give legal consent to medical treatment and, at bar, held to reasonably and logically encompass both mother and infant *in utero* within its definition of "patient".

Legislative recognition that the infant *in utero* is today as much the "patient" as the expectant mother may be found in section 2503 of the Public Health Law, which requires physicians and nurse-midwives to inform expectant mothers in advance of the drugs expected to be employed during pregnancy and at birth and of the possible effects of such drugs on the child and mother. This section was enacted in 1978, apparently in response to the furor over "DES" (diethylstilbestrol), a synthetic hormone given pregnant women between 1940 and 1970 to forestall threatened miscarriages, which was later discovered to cause cancer in the female offspring. Obviously, knowledge of possible adverse effects upon the fetus of drugs thought beneficial to the pregnant mother is crucial to the exercise of any right to give informed consent.

Finally, it ignores the realities of modern obstetrical practice to deny the infant *in utero* independent protection against incompetent medical advice. Generally speaking, the expectant mother who wishes to keep her child engages the obstetrician to guide her through pregnancy and, insofar as humanly possible, ensure the birth of a healthy infant. The latter consideration is uppermost in the minds of both mother and doctor and, when a nonfatal conflict between the well-being of mother and fetus arises, the obstetrician will today invariably opt to protect the fetus. Thus, for example, even treatment of the common cold could take on serious implications when the sufferer is an expectant mother, and such traditional remedies as aspirin and cough medicines may be eschewed out of concern for the fetus. The reasons for such caution is, of course, easy to

discern. Every year, the medical profession is increasing its knowledge as to the possible adverse effects upon the fetus of various drugs and other ingested substances previously thought to be harmless. Furthermore, increased use of prenatal diagnostic procedures and recent advances in the area of prenatal surgery will require even more care on the part of the obstetrician or prenatal specialist in advising the expectant mother of available treatment alternatives and consequences to the fetus when problems arise.

Since the failure to disclose the alternatives and reasonably foreseeable risks and benefits of treatment and invasive diagnostic procedures will usually result in direct physical injury to the fetus alone, as opposed to the mother, it is absolutely vital that the cause of action belong to the infant, born alive, as well as the mother. Although not necessarily falling within the purview of the cause of action for lack of informed consent, it might be recalled, for example, that neither Thalidomide nor "DES" caused any injury to the expectant mothers for whom they were prescribed. The consequences visited upon their offspring, however, were devastating. To deny an independent cause of action to the infant is to deny any recovery for direct physical injury, for the mother cannot recover in her own right for the infant's injuries. Should the mother decline to sue or find herself time barred, denominating the infant's cause of action as "derivative" would result in its dismissal. The doctrine of informed consent may not be so rendered nugatory in pregnancy-related cases. While it is true that the law is not required to provide relief for every injury suffered (*Howard v Lecher,* 42 NY2d 109, 111, *supra*), it has never yet denied recovery for actual physical injuries sustained as a direct and foreseeable result of a party's wrongful act. The only problem to be encountered here is one of proof and it is easily surmountable. As the appellants point out, the consent actually given by an expectant mother is necessarily one for "mother-with-child". She cannot consent for herself alone and withhold consent for the infant *in utero*. However, there is no reason why the mother must be a formal party to the action. It is enough that the infant plaintiff bears the burden of prov-

ing the lack of informed consent, presumably through the testimony of the mother among others.

In conclusion, we would emphasize that recognition of a viable cause of action for lack of informed consent in the infant plaintiff will in no way "require the extension of traditional tort concepts beyond manageable bounds" (*Howard v Lecher, supra,* at p 111). Recovery for harm is not being extended to persons other than those directly involved (see *Tobin v Grossman,* 24 NY2d 609). The medical practitioner is merely being compelled to disclose to the expectant mother the available alternatives to treatment and the reasonably foreseeable risks and benefits involved. The choice or decision is the mother's, but it must be made with knowledge of the risks to her unborn child. To the latter, an independent duty of disclosure, via the mother, is owed.

Accordingly, the order appealed from should be affirmed insofar as appealed from.

GIBBONS, J. P., THOMPSON and RUBIN, JJ., concur.

Order of the Supreme Court, Orange County, dated December 5, 1980, affirmed insofar as appealed from, with $50 costs and disbursements.